# IN THE UNITED STATES DISTRICT COURT FOR EASTERN DISTRICT OF MISSOURI SOUTHERN DIVISION

| | |
|---|---|
| DINOSAUR MERCHANT BANK LIMITED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | |
| BANCSERVICES INTERNATIONAL LLC, ) | |
| ) | |
| Defendant ) | |

## COMPLAINT

Plaintiff Dinosaur Merchant Bank Limited ("DMBL") alleges as follows:

## INTRODUCTION

1. This is an action for breach of contract, breach of good faith and fair dealing, and conversion. This is an action arising under the laws of Missouri. As set forth below Bancservices International LLC("BSI") improperly has withheld from DMBL $3,469,718.26 in funds entrusted to BSI for money transmission by BSI for the purchase of crude oil on behalf of a client of DMBL.

2. In brief, after failing to consummate the transfer of $17,348,645 as instructed by DMBL for the purchase of crude oil, BSI returned only $13,848,926.74 and, ignoring the terms of its contract with DMBL, BSI kept and seized 20% of the funds entrusted to it, creating out of whole cloth what it termed as a 5% processing fee of $867,429.63 for itself and a 15% holdback of $2,602,288.63 that may or may not be returned to DMBL when and how BSI chooses. Despite repeated demands BSI continues to refuse to honor its contract with DMBL and to return the funds.

3. DMBL, also referred to as plaintiff herein, is a private company organized under the laws of United Kingdom and is majority-owned by a citizen of State of New York. Under the laws of the United Kingdom DMBL is authorized to accept deposits, provide credit, give investment advice, and arrange deals in investments, as well as to provide payment services.

4. BSI, also referred to as defendant herein, is a limited liability company organized under the laws of the State of Missouri and is a registered money services business with FinCen.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the parties are diverse and the amount in controversy exceeds $75,000. BSI is a citizen of Missouri, which principal office is located in Charleston, Missouri, in the County of Mississippi and is in the southeastern division of the Eastern District of Missouri and is owned and operated by a citizen of Missouri. DMBL is a United Kingdom-regulated financial institution majority-owned and operated by a United States person, who is a citizen of New York. Pursuant to a contract described below, BSI has consented to being sued in the federal courts in Missouri.

6. Venue in this District is proper pursuant to 28 U.S.C. §1391 because the defendant and its agents, or certain of them, reside here or may be found here, a substantial part of the events giving rise to DMBL's claims occurred here, and the defendant transacts business here. In addition, by virtue of a contract described below, BSI has consented to venue in Missouri, in either federal or state courts.

## FACTS

7. One of DMBL's clients is Barnett Capital Bank. Barnett Capital Bank is an international financial institution located and registered in the Commonwealth of Dominica. One of Barnett Capital Bank's banking clients is DeJesus y DeJesus, a law firm located in Panama.

8.      On or about October 22, 2018, DMBL received $23,468,931.86 for deposit in the Barnett Capital Bank account held with DMBL.  The wire instructions advised that the purpose of the funds were for the further benefit of DeJesus y DeJesus and that the purpose of the funds were "/cost of goods, Boscan crude oil sales agreement dated 1/1/14 cargo load per vessel Mt. Stena Surprise with BL. 14707-703-1-1."

9.      On October 26, 2018, Barnett Capital Bank instructed DMBL to originate a wire transfer from its account at DMBL in the sum of $17,348,645, the funds to be sent to the Curacao bank Banco di Caribe N.V. for the benefit of an account maintained there by "Gemeenschappeljik Hof Van Justite, Curacao."  Gemeenschappeljik Hof Van Justite, Curacao is Dutch for Common Court of Justice, Curacao ("Curacao Court").  According to the wire instructions the wire was for "Cost of gods [sic] sales agreement cargo load per vessel Mt. Stena surprice [sic] with BL 14707/7031/1 Energy Coal Case."

10.     DMBL conducted a due diligence investigation between October 26, 2018, and October 30, 2018.  That investigation revealed the following:

       A.   DeJesus y DeJesus was a Panamanian law firm that was acting as an escrow agent in connection with a transaction for crude oil.

       B.   The crude oil, per a sales contract dated October 2, 2018, was being purchased by Tipco Asphalt Public Company Limited ("Tipco"), a Thai company, from Petroleos de Venezuela, S.A. ("PdVSA"), a Venezuelan company.  The agreed-upon purchase price was $23,468,931.86.

       C.   The crude oil referenced in the sales contract was the cargo of a vessel named the MT Stena Surprise which was located in Curacao and was the subject of an attachment order issued by the Curacao Court.

      D.      The oil that had been attached was the result of a pre-judgment attachment favoring an Italian company, Energy Coal.  Energy Coal has sued for failure to pay invoices during 2012-2014.  The pre-judgment attachment was for $17,348,645.  The Curacao Court had authorized PdVSA, instead of selling the oil at public auction, to find a buyer for the oil, if possible, as a means of satisfying the attachment lien.  The Curacao Court had required that if PdVSA found a private buyer the price had to be no less than $17,348,645.

      E.      Tipco was the private buyer to whom PdVSA had contracted to sell the crude oil and on October 22, 2018, Tipco had transferred the full purchase price for the crude oil, $23,468,931.645, to DeJesus y DeJesus as escrow agent and DeJesus y DeJesus had deposited those funds in an account with Bartlett Capital Bank.

11.    Based upon its due diligence DMBL concluded that the requested $17,348,645 transfer was for the purpose of lifting the Curacao Court-imposed attachment and enabling Tipco to take possession of the crude oil then stored as cargo in the MT Stena Surprise.

12.    DMBL's due diligence revealed that PdVSA was subject to OFAC sanctions in connection with any debt incurred by PdVSA after August 24, 2017.  The Curacao Court attachment had involved pre-August 24, 2017, and therefore did not fall under the sanctions.

13.    On October 30, 2018, DMBL engaged BSI to transmit the $17,348,645 wire to the Curacao Court's account at Banco di Caribe.  Along with the wire payment instructions, DMBL provided BSI with the fruits of its due diligence, including the contract of crude oil sale between PdVSA and Tipco, the escrow agreement between Tipco and DeJesus y DeJesus, a

4

letter from DeJesus y DeJesus describing the crude oil transaction, and two orders of the Curacao Court relating to the attachment of the crude oil cargo in the MT Stena Surprise.

14. BSI raised no question regarding the propriety of the transaction nor the sufficiency of the documentation provided to BSI by DMBL, nor did it raise any other question regarding the money transfer instruction given to BSI by DMBL.

15. DMBL had engaged BSI under the terms of a pre-existing agreement between BSI and DMBL, dated October 13, 2017, entitled the International Payment Services Agreement ("IPSA"). Upon information and belief, the IPSA is a standardized agreement created by BSI and required to be signed by its clients. BSI, in the IPSA, touts its product, known as BANCwire, which "automates complex, multi-currency settlements, compliance monitoring, and risk management functions" and further touts its "network of financial institutions and money transmitting businesses" that enable transfers through BANCwire. Under §15.1 the IPSA is to be governed by and construed in accordance with the laws of the state of Missouri, and all transactions and performance under the IPSA are deemed to have occurred in Missouri. Under §15.16, the prevailing party in litigation to enforce the IPSA shall be entitled to "all reasonable costs, charges, and expenses, including attorneys' fees, expended or incurred in connection therewith."

16. Upon information and belief, the source of which is communications between DMBL and BSI, BSI processed the $17,348,645 wire payment instruction in an effort to forward the funds from BSI to the Banco di Caribe account of the Curacao Court.

17. Upon information and belief, a the source of which is communications between DMBL and BSI, at some point downstream in the chain of transfers in connection with the

5

movement of the funds to the Banco di Caribe account of the Curacao Court, either Banco di Caribe or another bank in the chain rejected the payment and returned the $17,348,645 to BSI.

18. On or about November 21, 2018, DMBL requested that BSI send the $17,348,645 to a different account maintained by the Curacao Court, an account maintained at the Central Bank of Curacao, for the same purposes as the October 30, 2018, request. Additional documents were supplied to BSI to support the transaction.

19. On or about November 27, 2018, BSI told DMBL that the $17,348,645 was in the custody of ING, a Dutch multinational banking and financial institution, pending what BSI-characterized as a "compliance investigation."

20. On or about November 29, 2018, DMBL directed BSI to cancel the wire payment transfer and to return the $17,348,645 to DMBL.

21. On or about November 30, 2018, BSI informed DMBL that it was keeping $3,469,718.51 of the $17,348,645 DMBL had instructed be returned to DMBL. BSI kept $3,469,718.51, representing that it was entitled to a 5% "transaction fee" of $867,429.63 and a 15% "escrow holdback" of $2,602,288.63 in connection with the funds. BSI asserted that the escrow holdback would be kept by BSI "until we are satisfied that there are no damages, claims, losses, or other liability due to the nature of this transaction. Until such time, this amount will secure [DMBL]'s indemnification obligations under the Services Agreement and at any time we can apply any portion of this amount as needed to satisfy any related claim or if we do not receive the information needed to complete our investigation of this matter." The "Services Agreement" referred to was the IPSA.

22. By a communication dated December 3, 2018, DMBL objected to BSI's retention of the $3,469,718.51 and advised BSI that the IPSA in no way justified the effective seizure of the funds. DMBL demanded the immediate return of the funds.

23. All the funds at issue between BSI and DMBL were in United States dollars. The financial relationship between DMBL and BSI is governed by the IPSA, described above. Paragraph §1.3 of the IPSA sets forth the fees as a "Max. USD 30.00 per transaction" and a "% charge per transaction of 0.3%" and a fee of any incoming wires of "USD 20.00."

24. Any transaction fee in connection with the transfer of the $17,348,645, therefore, would have been far less than $867,429.63. Notably, 0.3% of $17,348,645 even if that fee applied to an unconsummated transaction would have been $52,045.94. No part of the IPSA refers either to a 5% transaction fee or an escrow holdback, much less a 15% escrow holdback.

25. Under §5.1 of the IPSA the schedule of fees is subject to change, but requires advanced written notification of any fee change by BSI and consent by DMBL before imposition of a change of fees. Neither took place here.

26. Under §1.6 of the IPSA each party to the IPSA is responsible for its own expenses, unless specified otherwise in the IPSA. As a result DMBL could not have been responsible for any expenses incurred by BSI in connection with its money transmitting services.

27. The IPSA does not provide that BSI may unilaterally create an "escrow holdback," much less determine the amount of such an "escrow holdback." The IPSA does provide for, in §§10.3 and 10.4, for certain indemnifications. But the circumstances of indemnification stated therein are inapplicable here. And, notwithstanding that, the indemnification clause does not permit BSI to pre-emptively withhold funds placed into its temporary custody, much less determine the amount of such a "holdback."

7

28. DMBL has made repeated demands for the return of the $3,469,718.51 withheld by BSI, minus the limited fees to which BSI would be entitled to under §1.3 of the IPSA. BSI has refused.

29. Over four months has passed since BSI refused to return the $3,469,718.51 being withheld.

30. The only provision of the IPSA that BSI, through counsel, has pointed to is section 3.3. In an email dated December 28, 2018, counsel asserted that section 3.3 permits either party "hold disputed amounts in escrow." Section 3.3 of the IPSA is titled "Discrepancies" and it provides, "Any challenges by the Originating Party to the Net Settlement Process and/or any discrepancies in the Net Settlement Process shall be reconciled in good faith by the Parties on an immediate basis. Each Party agrees either (i) not to deposit, or (ii) to hold in escrow, any Net Settlement Amount that is disputed by the other Party."

31. The Net Settlement Process is simply the settlement of the amounts going into and out of a client's account in the course of the day to determine who owes whom what and is so defined in the first section numbered 1.1 of the IPSA. Section 3.3 contemplates challenges by the Originating Party, which is defined in second section numbered 1.1 of the IPSA as being DMBL. Further, nothing in section 3.3 authorizes BSI to create a transaction fee nor does it authorize BSI to determine unilaterally an amount to seize and hold for an indefinite period. Section 3.3 does not create a right in BSI to second-guess a decision to attempt to transmit funds and claim to hold monies as a form of advance indemnification based upon a mere possibility that an event will occur at some point in some indefinite future.

32. Although BSI had at no point blocked or rejected the transfer of the funds entrusted to it by DMBL on the basis of claims of economic sanctions, or asked questions of

8

DMBL based upon the due diligence documents provided to BSI, BSI represented in a communication on or about December 13, 2018, that for BSI to release funds to DMBL, DMBL was obliged "to coordinate with OFAC and/or FinCEN to investigate this transaction and to provide written assurance to BSI, it would greatly accelerate the BSI investigation into this matter." DMBL is aware of no report by BSI to OFAC or FinCEN related to the transaction or communications with either agency about the transaction.

33. In order to resolve the situation, DMBL, on December 19, 2018, via email, sought guidance from OFAC regarding whether the contemplated transaction would have violated OFAC sanctions. At the time PdVSA was subject to certain sanctions relating to debt or credit incurred after August 25, 2017.

34. OFAC responded by email that same day that based upon the sanctions then imposed on PdVSA, which prohibited dealings in new credit or debt to PdVSA incurred on or after August 25, 2017, the contemplated transaction would not have been violated OFAC sanctions because it involved debt to PdVSA incurred prior to August 25, 2017. Additionally, OFAC advised that a payment to PdVSA for oil, in any event, would not have been prohibited as new debt regardless.

35. As set forth in OFAC's email, "the Venezuela sanctions program only prohibits the extension of credit or debt to PDVSA incurred on or after August 25, 2017 which cannot exceed a maturity or period to pay it back of longer than 90 days. Assuming there are no Specially Designated Nationals (SDNs) involved and assuming there are no entities involved that are owned 50% or more by SDNs, then the prohibitions on PDVSA for new debt with the maturity threshold of longer than 90 days do not seem to apply; meaning the transaction with payment to PDVSA for the oil would not be prohibited." None of the relevant documents

involved in the transactions were issued by or involved SDNs or known to involve entities that are owned 50% or more by SDNs.

36. DMBL shared the results of its communications with BSI. BSI continued to refuse to return the funds to DMBL. BSI, in an email dated January 14, 2019, that "there is no need to talk unless and until we have received assurance from OFAC that BSI specifically is not subject to any liability for facilitating this transaction. Again, the OFAC response you forwarded is limited to addressing whether or not the payment to PdVSA is prohibited as new debt, not whether BSI is subject to liability for facilitating the transaction."

37. On January 28, 2019, after the above events, OFAC issued additional sanctions targeting Venezuela and PdVSA. Although to date no response has been received from OFAC, DMBL thereafter took the additional step of asking OFAC to confirm its prior written advice and to state specifically that there is no blockable interest in the $3,469,718.51 held by BSI or, in the alternative, issue a license authorizing DMBL to engage in all transactions necessary and ordinarily incident to the return of the funds to it and then back to Tipco.

### COUNT I
### (Breach of Contract)

38. Plaintiff DMBL re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 37, above.

39. The IPSA was and is a written contract with specific terms and which applied to the business relationship between DMBL and BSI. Pursuant to the IPSA, DMBL entrusted $17,348,645 with BSI with instruction to transmit the funds to the Curacao Court. BSI's remuneration for its services was set forth in the contract and failing to consummate the transaction BSI was obliged to return the funds DMBL. By failing in its contractual obligations,

BSI materially breached the IPSA and by keeping $3,469,718.51 and refusing demands for its return, DMBL has been damaged in that sum.

## COUNT II
### (Breach of Good Faith and Fair-dealing)

40. Plaintiff DMBL re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 39, above.

41. BSI has failed to act in good faith and fair dealing with DMBL. In every contract subject to Missouri law there is a covenant of good faith and fair dealing. The IPSA was and is a written contract with specific terms and which applied to the business relationship between DMBL and BSI. Pursuant to the IPSA, DMBL entrusted $17,348,645 with BSI with instructions to transmit the funds to the Curacao Court. BSI was obliged to either carry out the instruction or return the funds to DMBL minus IPSA agreed-upon fees. Instead of doing so, BSI kept 20% of the $17,348,645 unilaterally creating a "transaction fee" and an "escrow holdback" for an indeterminate period of time.

42. By so doing BSI has not acted in good faith and has not fairly dealt with DMBL under the IPSA and in the business relationship resulting from the IPSA.

43. Even when DMBL took additional steps, contacting OFAC and obtaining comfort from OFAC that the transaction that had been requested by DMBL was not violative of OFAC, BSI continued to refuse to abide by the IPSA or to deal fairly with DMBL in good faith.

44. BSI has acted bad faith contrary to the terms and to evade its obligations in the business relationship with DMBL.

## COUNT III
### (Conversion)

45. Plaintiff DMBL re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 44, above.

46. Pursuant to the IPSA DMBL entrusted BSI with temporary custody of $17,348,645 to be transferred to the Curacao Court. When the transaction failed to consummate, BSI was obliged to return the funds to DMBL. BSI kept a $3,469,718.51, some 20% of the funds. DMBL had and has a greater right to possession of those funds than BSI.

47. BSI has asserted a right to ownership of 5% of those identifiable and specific funds, $867,429.63, as a processing fee.

48. BSI has asserted a unilateral right to possession and seizure of 15% of those identifiable and specific funds, $2,602,288.63, as a holdback. BSI has asserted all earmarks of ownership over those funds, including when and how those funds will be spent and used.

49. The unauthorized assumption and exercise of ownership rights over the property of DMBL entrusted with BSI to the exclusion of DMBL has resulted in a conversion of the funds by BSI to the exclusion of the DMBL's rights.

50. Because the funds were placed in the custody of BSI for a specific purpose and BSI has diverted those funds to something other than such specified purpose BSI had subjected itself to liability in conversion regardless of good faith.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff DMBL prays that this Court enter a judgment as follows:

    a. Awarding judgment in favor of DMBL on all the claims and counts for relief;

    b. Awarding plaintiff DMBL $3,469,718.51 in compensatory damages or in the amount according to the proof against BSI, including the amounts for all

losses and damages suffered as well as punitive damages together with pre-judgment and post-judgment interest;

c. Awarding plaintiff DMBL attorneys' fees pursuant to the terms of the IPSA; and

d. Awarding plaintiff DMBL such other and further legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 2.04, DMBL hereby demands a jury trial on all issues so triable.

Dated: May 23, 2019

    Respectfully submitted,

    DENTONS US LLP

    */s/ Brian P. Baggott*
    Brian P. Baggott MO #58494
    Steven M. Aaron, MO #41653 *(admission pending)*
    Brian K. O'Bleness, MO #53368 *(admission pending)*
    4520 Main Street, Suite 1100
    Kansas City, Missouri 64111
    Telephone: 816-460-2400
    Facsimile: 816-531-7545
    brian.baggott@dentons.com
    steven.aaron@dentons.com
    brian.obleness@dentons.com

    *Attorneys for Plaintiff Dinosaur Merchant Bank Limited*

110993243