UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

DINOSAUR MERCHANT BANK LIMITED, )
                                 )
                    Plaintiff,   )
                                 )
v.                               )    Case No.  1:19 CV 84 ACL
                                 )
BANCSERVICES INTERNATIONAL LLC,  )
                                 )
                    Defendant.   )

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Dinosaur Merchant Bank Limited's Motion for Judgment on the Pleadings.  (Doc. 18.)  For the following reasons, the Court will grant Plaintiff's Motion.

## I.      Background

Plaintiff Dinosaur Merchant Bank Limited ("Dinosaur") brought this action alleging breach of contract, breach of good faith and fair dealing, and conversion against Defendant Bancservices International, LLC ("BSI").  Dinosaur's claims arise out of a contract (the International Payment Services Agreement or "IPSA") between Dinosaur and BSI dated October 13, 2017.  Under the IPSA, Dinosaur engaged BSI to provide payment services for Dinosaur. Dinosaur claims that BSI improperly withheld $3,469,718.26 in funds Dinosaur entrusted to BSI for the transmission of money to purchase crude oil on behalf of Dinosaur's client.  The Complaint requests an award of $3,469,718.26 in compensatory damages, as well as punitive damages, pre-judgment interest and post-judgment interest; and attorneys' fees pursuant to the terms of the IPSA.

BSI filed a Counterclaim, setting forth claims for fraud, breach of contract, and indemnity.  BSI alleges that Dinosaur failed to disclose to BSI information material to the

transaction at issue that would have raised significant compliance issues and may have caused the transaction to be rejected by other involved parties.

In its Motion, Dinosaur argues that it is entitled to a judgment on its Complaint directing the return of its funds wrongly withheld by BSI, and an award of expenses and attorneys' fees. Dinosaur further argues that the Counterclaim should be dismissed for failure to state an actionable claim. BSI opposes the Motion. (Doc. 31.) Dinosaur has filed a Reply, in which it requests oral argument on its Motion. (Doc. 32.) The Court finds that the pleadings are sufficient to resolve Dinosaur's Motion and will therefore deny Dinosaur's request for oral argument.

## II.    Legal Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings should be granted when, accepting all facts pled by the nonmoving party as true and drawing all reasonable inferences from the facts in favor of the nonmoving party, the movant has clearly established that no material issue of fact remains and that the movant is entitled to judgment as a matter of law. *Schnuck Markets, Inc. v. First Data Merchant Services Corp.*, 852 F.3d 732, 737 (8th Cir. 2017). As will be discussed below, a motion for judgment on the pleadings is analyzed differently depending on whether the motion seeks a merits disposition or seeks to press a Rule 12 defense. Dinosaur does both in its Motion.

## III.    Facts

Dinosaur sets out its version of the relevant facts in the Complaint. (Doc. 1.) BSI denies most of those facts on the basis it has insufficient information to form a belief as to the allegations. (Doc. 9.) The Court sets forth the following summary merely to provide context to

the allegations and does not consider them in ruling on the Motion. Any material disputes are set forth and discussed in the Court's analysis.

Dinosaur is a private company organized under the laws of the United Kingdom and is majority-owned by a citizen of the State of New York. Under the laws of the United Kingdom, Dinosaur is authorized to accept deposits, provide credit, give investment advice, and arrange deals in investments, as well as provide payment services. BSI is a limited liability company organized under the laws of the State of Missouri and is a registered money services business.

On *October 30, 2018*, Dinosaur enlisted the services of BSI to assist it with a transaction involving the purchase of Boscan crude oil by a Thai asphalt company (Tipco Asphalt Public Company Limited, hereinafter "Tipco") from a Venezuelan petroleum company (Petroleos de Venezuela, S.A., hereinafter "PdVSA"). In this instance, PdVSA intended to sell Tipco a quantity of oil[1] that was being stored aboard a vessel, the Stena Surprise, against which a prejudgment attachment had been entered by a Curacao Court. The attachment was entered against PdVSA for the benefit of an Italian energy company, Energy Coal, to satisfy a debt PdVSA owed to Energy Coal that accrued between 2012 and 2014. The attachment allowed PdVSA to find a buyer for the oil rather than selling it at a public auction, so long as the sales contract was for at least $17,348,645.

PdVSA and Tipco had previously entered into a Sales Contract for the delivery of Boscan crude oil, subject to PdVSA's availability. The Sales Contract set forth the "Particular

---

[1]A net of 380,225 barrels of Boscan crude oil, each containing 42 U.S. gallons for a total of 15,969,450 gallons of oil. *See* Quantity Certificate prepared by the Refineria Isla Curacao B.V. dated February 10, 2018 (Doc. 17-1 at p. 14); Cargo Manifest dated October 2, 2018 (Doc. 17-1 at p. 20); Bill of Lading from the Refineria Isla Curacao B.V. dated October 2, 2018 (Doc. 17-1 at p. 10).

Conditions of Sale" for the time period of *January 1, 2014 through December 31, 2017*; it was numbered SA144531 and signed by a representative of Tipco on January 13, 2014.

Between October 20 and 22, 2018, an Escrow Agreement (Doc. 17 at pp. 21-25) concerning the oil purchase was signed by representatives of PdVSA, Tipco, and a Panamanian law firm named De Jesus & De Jesus (identified as "Escrow Agent"). The Escrow Agreement noted that PdVSA and Tipco agreed upon a purchase price of $23,468,931.86 for the Boscan crude oil.[2] A portion of the agreed sale price, a total of $17,348,645, was to be paid to the Curacao Court to pay Energy Coal's attachment lien. The remainder of the $23,468,931.86 totaling $6,120,286.86 was to remain with the Escrow Agent.

To consummate the sales contract for the 380,225 barrels of oil between Tipco and PdVSA, De Jesus & De Jesus used Barnett Capital Bank (an international financial institution located and registered in the Commonwealth of Dominica) to deposit $23,468,931.86 with Dinosaur on *October 22, 2018*. According to Dinosaur, the wire instructions advised that the purpose of the funds was for the further benefit of De Jesus & De Jesus and that the purpose of the funds were "cost of goods, Boscan crude oil sales agreement dated 1/1/14 cargo load per vessel Mt. Stena Surprise with BL. 14707-703-1-1." (Doc. 1 at ¶ 8.)

On *October 26, 2018*, Barnett Capital Bank instructed Dinosaur to originate a wire transfer from its account with Dinosaur in the sum of $17,348,645, the funds to be sent to the Curacao bank Banco di Caribe N.V. for the benefit of an account maintained there by "Gemeenschappeljik Hof Van Justite, Curacao," which is Dutch for Common Court of Justice, Curacao ("Curacao Court"). *Id.* at ¶ 9. According to the wire instructions the wire was for "Cost

---

[2] *See also* Doc. 17-1 at p. 4 (letter from PdVSA to Tipco dated October 10, 2018 and referred to as the "Payment Instruction"); and Doc. 17 at p. 20 ("Form of Acknowledgment" dated October 22, 2018 from Tipco).

of gods [sic] sales agreement cargo load per vessel Mt. Stena surprice [sic] with BL

14707/7031/1 Energy Coal Case." *Id.*

Dinosaur reportedly engaged in a due diligence investigation between October 26, 2018,

and October 30, 2018. *See* Doc. 1 at p. 3-4. Dinosaur states that it concluded from its

investigation that the requested $17,348,645 transfer was for the purpose of lifting the Curacao

Court-imposed attachment and enabling Tipco to take possession of the crude oil then stored as

cargo in the MT Stena Surprise. Dinosaur further states that it discovered that PdVSA was

subject to OFAC[3] sanctions in connection with any debt incurred by PdVSA after August 24,

2017. Dinosaur asserts that the Curacao Court attachment had occurred pre-August 24, 2017,

and therefore did not fall under the sanctions.

On *October 30, 2018*, Dinosaur engaged BSI to transmit $17,348,645 using its

BANCwire product to the Curacao Court's account at Banco di Caribe Bank pursuant to the pre-

existing IPSA ("Transaction"). Dinosaur states that, along with the wire payment instructions, it

provided BSI with the "fruits of its due diligence, including the contract of crude oil sale

---

[3]The Office of Foreign Assets Control (OFAC) is under the U.S. Department of the
Treasury. The OFAC:

> administers and enforces economic and trade sanctions based on US foreign policy
> and national security goals against targeted foreign countries and regimes, terrorists,
> international narcotics traffickers, those engaged in activities related to the prolifer-
> ation of weapons of mass destruction, and other threats to the national security,
> foreign policy or economy of the United States. OFAC acts under Presidential
> national emergency powers, as well as authority granted by specific legislation, to
> impose controls on transactions and freeze assets under US jurisdiction. Many of
> the sanctions are based on United Nations and other international mandates, are
> multilateral in scope, and involve close cooperation with allied governments.

*See* U.S. Department of the Treasury, About the Office of Foreign Assets Control (OFAC)
within the Office of Terrorism and Financial Intelligence, http://www.treasury.gov/
about/organizational-structure/offices/ pages/ office-of-foreign-assets-control.aspx, last visited
December 2, 2019.

between PdVSA and Tipco, the escrow agreement between Tipco and De Jesus & De Jesus, a letter from De Jesus & De Jesus describing the crude oil transaction, and two orders of the Curacao Court relating to the attachment of the crude oil cargo in the MT Stena Surprise." *Id.* at ¶ 13.

BSI accepted the Transaction. At some point downstream in the chain of transfers involved in the Transaction, either Banco di Caribe or another bank in the chain rejected the payment and returned the $17,348,645 to BSI. On *November 21, 2018*, Dinosaur requested that BSI send the $17,348,645 to a different account maintained by the Curacao Court, for the same purposes as the October 30, 2018 request. (Doc. 17-2 at pp. 3-4.) On *November 29, 2018*, Dinosaur directed BSI to cancel the wire payment transfer and to return the $17,348,645 to Dinosaur.

On *November 30, 2018*, BSI informed Dinosaur that it was retaining $3,469,718.26 and returning only $13,848,926.74 of the $17,348,645 Dinosaur had instructed be returned to Dinosaur. *See* Doc. 15-5 at pp. 2-3. BSI represented in this communication that it was entitled to a 5% "transaction fee" of $867,429.63, and a 15% "escrow holdback" of $2,602,288.63 in connection with the funds. *Id.* BSI noted:

> We are continuing to examine the reasons for the payment rejection and continue to be concerned that this payment has subjected us to substantial potential legal and financial risk given that it was rejected by the recipient bank and given that it involved Petroleos de Venezuela, S.A. ("PdVSA"), an entity considered part of the Government of Venezuela and subject to various prohibitions and sanctions imposed by the United States Office of Foreign Assets Control ("OFAC") as well as various recent corruption allegations.

*Id.* at 2. While BSI expressed appreciation for Dinosaur's assistance in investigating the payment rejection, it stated that additional information was needed. In particular, "one item we need to receive is documentation from the Curacao court that authorizes this payment given that

Payment Request BCB2117 was rejected." *Id*. BSI then requested "documentation from the Curacao court that directs any payment from Tipco Asphalt Public Company Ltd ("Tipco") to be paid to the Curacao court." *Id*. As further explanation for deducting a processing fee and holding funds in escrow, BSI explained:

> Also, in the October 10, 2018 "Payment Instruction" delivered by PdVSA to Tipco, PdVSA indicates that the purchase price under the contract between PdVSA and Tipco is USD $23,468,931.86. Accordingly, it appears that USD $17,348,645 of the purchase price was needed to pay PdVSA's creditors and release the seized cargo from the Curacao court. We are examining to understand what portion of the USD $6,120,286.86 balance has been or will be paid to PdVSA, but any information you can provide would be appreciated…

*Id*. BSI added:

> Upon our satisfaction that there are no damages, claims, losses or other liability resulting from this transaction (after our confirmation that we have received all requested documentation to our satisfaction), we will remit to Dinosaur the remaining escrow amount, less any amounts needed to satisfy such damages, claims, losses or other liability. If within sixty (60) days of the date of this correspondence we have not reached such satisfaction for any reason (including any failure by Dinosaur to deliver any and all requested supporting documentation), the then remaining balance of the escrow shall be remitted to BSI (or any BSI-designated entity) and Dinosaur shall have no further claim to such amount.

*Id*. at 3.

In response, counsel retained by Dinosaur emailed a letter (Doc. 15-6) to BSI on December 3, 2018, wherein BSI demanded return of the "$17,348,645, minus applicable fees, by no later than December 7, 2018." *Id*. at 3. Dinosaur's counsel further disagreed with BSI's imposition of the $867,429.63 transaction fee and holdback in escrow of $2,602,288.63. Counsel explained:

> DMBL values its continued relationship with Bancservices International LLC. To that end, DMBL shared, and will continue to share, the results of its extensive trans-action due diligence with you. We note that the underlying legitimate business pur-pose of the $17,348,645 originated by DMBL for the benefit of Gemeenschappellijik

Hof Van Justitie of Curacao, i.e., the Curacao Court, was clear. The payment was made to satisfy an order of that court in a proceeding related to judgements obtained by PdVSA creditors. True, the recipient bank rejected the transaction, apparently for compliance reasons. We cannot state with certainty why the recipient bank rejected the transaction. We do not believe on the basis of the available information that the transaction violated U.S. or other sanctions. As you may know, the Curacao court has scheduled a hearing for Friday, December 7, 2018, apparently to obtain an update regarding the status of the transaction.

DMBL, like you, continues to inquire regarding the nature and purpose of the $6,120,286 held by De Jesus & De Jesus. Pursuant to the escrow agreement DMBL obtained from its client, and which DMBL provided to you, De Jesus & De Jesus is the escrow agent for PdVSA and Tipco Asphalt, PdVSA's counterparty with respect to the Curacao court-managed transaction related to certain Curacao court-attached PdVSA assets. The escrow agreement states that any amount in excess of $17,348,645 (i.e. the sale amount imposed by the Curacao court) and the actual sale amount paid by PdVSA's counterparty (which resulted in the residual $6,120,286.86) would be used to pay other PdVSA obligations upon PdVSA's written instructions. De Jesus & De Jesus assert, in a letter that DMBL supplied to you, that the residual funds would be used to pay attorney and courts fees. DMBL continues to investigate this issue.

Notably, the Curacao court-required transaction involving the $17,348,645 does not involve the residual funds currently held by De Jesus & De Jesus. *Until DMBL has satisfied its anti-money laundering and sanctions-related inquiries with respect to the residual $6,120,286.86, it will execute no transaction related to these funds*.

*Id*. at 4 (Emphasis supplied.).

## IV. Discussion

Dinosaur argues that it is entitled to judgment on the pleadings because BSI was not entitled to unilaterally set a fee not provided for by the IPSA and was not entitled to unilaterally retain funds for indemnification. Dinosaur attached the IPSA (Doc. 15-1), BSI's November 30, 2018 letter (Doc. 15-5), and Dinosaur's December 3, 2018 letter (Doc. 15-6) to its Answer to BSI's Counterclaim (Doc. 15-1). Additionally, Dinosaur attached a copy of the payment order and supporting materials initially provided to BSI by Dinosaur (Doc. 17), a modified payment

order (Doc. 17-2), as well as communications and other documents provided by Dinosaur to BSI in connection with the Transaction (Doc. 17-1).  With regard to BSI's Counterclaim, Dinosaur contends that BSI fails to provide allegations that would support a claim of fraud, breach of contract, or indemnification.

BSI argues that Dinosaur cannot rely on the documents it attached to its pleadings to support its Motion.  BSI further contends that Dinosaur is not entitled to judgment on the pleadings as to the Complaint or Counterclaim, because BSI's actions were expressly permitted under the IPSA.

## A.    Dinosaur's Complaint

In its Complaint, Dinosaur asserts claims of breach of contract, breach of good faith and fair dealing, and conversion based on BSI's withholding of $3,469,718.26 of the funds from the failed Transaction.

When, as here, a party seeks a merits disposition of the dispute, a motion for judgment on the pleadings provides "a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings," and exhibits incorporated by the pleadings.  Wright & Miller, *Federal Practice and Procedure*: Civil 3d § 1367.  A motion for judgment on the pleadings "only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court."  *Stewart v. City of St. Louis*, No. 4:04CV885 RWS, 2006 WL 389837, at *1 (E.D. Mo. Feb. 17, 2006) (quoting Wright & Miller, § 1367).

### 1. Documents Embraced by the Pleadings

As an initial matter, the Court must determine what materials it may consider in ruling on Dinosaur's Motion. BSI argues that Dinosaur cannot rely on the documents it attached to its Answer to BSI's Counterclaim, because BSI has not admitted to the facts set forth in the documents.

BSI accurately notes that Federal Rule of Civil Procedure 7(a) permits a reply to an Answer only by court order, and that any allegations set forth in an answer are automatically denied. *See* Fed. R. Civ. P. 8(b)(6). BSI contends that, because it has denied the allegations set forth in the Answer by operation of Rule 8(b)(6), Dinosaur cannot rely on these facts to justify a judgment on the pleadings. BSI contends that the only material facts that are undisputed between the parties are the existence of the IPSA and BSI's retention of $3,469,718.26 of the rejected payment attempted under the IPSA. Finally, BSI concedes "in good faith," that the terms of the IPSA as set forth in Dinosaur's Exhibit 1 to its Answer have been embraced by the pleadings. Dinosaur responds that the Court may consider all of the attached documents because they are embraced by the pleadings.

When considering a motion for judgment on the pleadings, the Court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *see also* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1357, at 299 (1990) (court may consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint").

Here, there is no doubt that the IPSA (Doc. 15-1) can be considered as material embraced by the pleadings. The IPSA is the agreement governing the parties' relationship and is the basis

of the parties' claims. Dinosaur attached the IPSA to its Answer to Counterclaim, and BSI does not dispute the terms of the IPSA. (Doc. 31 at p. 6.)

The Court will also consider the payment order and supporting materials initially provided to BSI by Dinosaur (Doc. 17), BSI's November 30, 2018 communication informing Dinosaur it was retaining funds and providing an explanation for such (Doc. 15-5), and Dinosaur's December 3, 2018 communication to BSI objecting to the retention of the funds (Doc. 15-6). These documents are all referenced in Dinosaur's Complaint and are central to Dinosaur's claims. Although BSI was not automatically afforded an opportunity to respond to these documents by virtue of Rule 8, BSI does not object to the genuineness or authenticity of the documents. In fact, as Dinosaur notes in its Answer, BSI stated that the contents of its November 30, 2018 communication "speak for themselves." (Doc. 9 at p. 8.) Thus, the Court finds that these documents are integral to the Complaint and will consider them in ruling on Dinosaur's Motion.

### 2.    Dinosaur's Breach of Contract Claim

Although the failed Transaction involved multiple international parties and institutions, this matter does not involve factual disputes or issues of international law. Instead, the issue presented in this case is simply whether the IPSA allows BSI to retain $3,469,718.26 of the funds from the failed Transaction. The material facts agreed upon by the parties—the terms of the IPSA and BSI's retention of the funds—together with the materials embraced by the pleadings are sufficient to resolve Dinosaur's breach of contract claim as a matter of law.

The parties agree that Missouri law governs transactions under the IPSA. "Under Missouri law, a breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant

to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Smith Flooring, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co.*, 713 F.3d 933, 941 (8th Cir. 2013) (internal quotation marks and citation omitted).

Dinosaur argues that BSI breached the IPSA when it notified Dinosaur on November 30, 2018 that the return of the failed Transaction funds would be subject to additional terms. Specifically, BSI stated that it was deducting a 5% processing fee; and holding 15% of the funds in escrow until BSI was satisfied there was no liability from the failed Transaction. Dinosaur argues it did not agree to the proposed fees or escrow holdback and that these terms violate the IPSA.

The Court next turns to the language of the IPSA. Dinosaur argues that the only fee to which BSI is entitled is that specified in § 1.3 of the IPSA. That section provides as follows regarding BANCwire fees:

> Deposits received in our USD Bank account for payments:
> Max. USD 30.00 per transaction
> Min. USD 4.99 per transaction
> % charge per transaction 0.3%
> Dormant account 0.3% per month, min USD 50.00
> Incoming wire fees USD 20.00

(Doc. 15-1 at p. 3.) Section 5.1 of the IPSA permits the fee schedule to change, but requires advance notification by BSI as well as consent by Dinosaur before a new fee schedule can be imposed. *Id.* at 5. In addition, Dinosaur points out that § 1.6 of the IPSA provides that each party shall be responsible for its own costs and expenses except "as specifically set forth herein." *Id.* Dinosaur, therefore, argues that the only fees to which BSI is entitled under the IPSA is $30, a 0.3% charge, and an incoming wire fee of $20.

BSI first argues that Dinosaur has failed to plead its performance of its obligations under the IPSA. It states that, even if it were properly pled, BSI's Counterclaim sets forth a claim that

Dinosaur breached the IPSA. Second, BSI argues that the language of the IPSA shows no breach of contract. Specifically, BSI contends that the provisions related to the "Net Settlement Process" provide authority for BSI's withholding of funds.

Section 2.3, titled "Expiration of Payment Orders," states that undeliverable payment orders are deemed to have expired. This provision requires the paying party (BSI) to debit the amount of the expired payment order and credit it to the originating party (Dinosaur) "in the Net Settlement Process on the date of expiration." *Id.* at 4. The "Net Settlement Process" is defined as "the daily process under which the Parties shall net any and all amounts owing between the Parties which include the amount of the payment and all BANCwire Fees (e.g., accounts payable netted against accounts receivable) so that all such amounts result in a single amount payable by one Party to the other Party." *Id.* at 3. Section 3.1 states that the paying party shall perform the Net Settlement Process at the end of each business day and, as a result, the Net Settlement Amount due to the Daily Creditor by the Daily Debtor shall be deposited in the Daily Creditor's account. *Id.* at 4. Section 3.3 governs "discrepancies" in the Net Settlement Process and provides as follows:

> Any challenges by the *Originating Party* to the Net Settlement Process and/or any discrepancies in the Net Settlement Process shall be reconciled in good faith by the Parties on an immediate basis. Each Party agrees either (i) not to deposit, or (ii) to hold in escrow, any Net Settlement Amount that is disputed by the other Party.

*Id.* (Emphasis supplied.)

BSI states that the provisions of Article 3 cited above require the parties to work in good faith to determine amounts owed between the parties following an undeliverable payment order. According to BSI, the Transaction was rejected because it potentially violated sanctions placed upon certain individuals and companies in Venezuela. BSI states that the ongoing investigation into potential international sanctions "could result in fines and penalties, leading to a dispute as

to how much of the failed transaction should be returned to Dinosaur under the Net Settlement Process set forth in the IPSA." (Doc. 31 at p. 8.) BSI contends that there is, therefore, a discrepancy under the Net Settlement Process, and "under the express authority granted under § 3.3 of the IPSA, BSI has retained a portion of the funds." *Id.*

The Court finds that Dinosaur is entitled to judgment on the pleadings as to its breach of contract claim. The IPSA does not authorize the withholding of funds in the manner described in BSI's November 30, 2018 communication. BSI deducted from the failed Transaction funds a "5% processing fee" ($867,429.63) and "held in escrow an amount equal to 15%" ($2,602,288.88). The IPSA provides for neither. The terms of the contract set forth the permissible fees. Section 1.3 allows for fees in the amount of "Max. USD 30.00 per transaction," a "% charge per transaction of 0.3%," and a fee of any incoming wires of "USD 20.00." (Section 1.3, Doc. 15-1 at p. 3.) There is no provision in the IPSA permitting a 5% "processing fee" in the event of a failed transaction or under any other circumstances.

Similarly, the IPSA does not permit BSI to hold funds in escrow until BSI is "satisfied that there are no damages, claims, losses or other liability." (Doc. 15-5 at p. 2.) Dinosaur acknowledges that the IPSA includes an indemnification clause that would include any losses and liabilities BSI suffers. (Doc. 19-1 at pp. 20-21.) Specifically, under § 10.3 of the IPSA, the parties agreed to "defend, indemnify, and hold harmless the other Party…from any and all loss, cost, expense, claim, damage (including reasonable attorney's fees and costs at both the trial and any appellate level) or liability suffered or incurred…arising from, caused by, or attributed to…willful misconduct, fraud, intentional tort or negligence by the indemnifying party…" (Doc. 15-1 at p. 8.) This provision, however, does not permit BSI to withhold entrusted funds from a failed transaction in mere anticipation of a potential claim or loss. To date, BSI does not allege

that an actual claim has been presented against it or that it suffered a loss directly attributed to the failed Transaction.

Additionally, § 10.4 of the IPSA is an indemnity provision that addresses "Infringement of Laws." It provides:

> Each party shall defend, indemnify, and hold harmless the other Party for any action, or claim for any action, brought by third parties, including without limitation any Authorities, that derive from the infringement or violation of the applicable legal provisions in the applicable jurisdiction by either Party and/or any third party hired by the same to assist in its obligations under this Agreement including without limitation, those claims of an administrative, civil, and/or criminal nature, as well as any responsibility or expense (including attorney's fees and legal costs at all trial and appellate levels) related to such claims or actions.

*Id.* Should there be future action by OFAC against BSI as highlighted in BSI's November 30, 2018 letter to Dinosaur (Doc. 15-5), this provision may apply. Like § 10.3 of the IPSA, the "Infringement of Laws" indemnification provision does not permit BSI to withhold entrusted funds from a failed transaction in mere anticipation of a potential claim or loss.

Contrary to BSI's argument, the provisions of the IPSA regarding the Net Settlement Process do not justify BSI's retention of the funds at issue. The Net Settlement Process is simply the daily accounting process by which the parties are credited or debited amounts related to payments "and all BANCwire fees." The BANCwire fees are defined in § 1.3 as set out above. Section 3.3 directs that any "discrepancies" should be resolved in good faith and that the parties hold in escrow any disputed amounts. When these provisions are read together, it is clear that § 3.3 describes a procedure by which either mathematical errors or disputes regarding BANCwire fees can be expeditiously resolved. This provision cannot be construed as conveying the right to unilaterally create fees, new terms, or place funds in escrow in contravention of the terms of the IPSA.

15

If a contract is unambiguous, "the terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning." *Dunn Indus. Grp., Inc. v. City of Sugar Creek,* 112 S.W.3d 421, 428 (Mo. 2003). "[E]ach term of a contract is construed to avoid rendering other terms meaningless. A construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Id.* (internal citations omitted). BSI's interpretation of § 3.3 is unreasonable and would render the provisions of the contract governing fees, expenses, and expired payment orders meaningless.

BSI's argument that Dinosaur failed to plead that it performed its obligations under the IPSA also lacks merit. Dinosaur's Complaint alleges that, pursuant to the IPSA, it "entrusted $17,348,645 with BSI with instruction to transmit the funds to the Curacao Court." (Doc. 1 at ¶ 39.) It further states that BSI's "remuneration for its services was set forth in the contract and failing to consummate the transaction BSI was obliged to return the funds" to Dinosaur. *Id.* These allegations adequately plead that Dinosaur performed its obligations under the IPSA.

BSI next contends that its asserted affirmative defenses and allegations in the Counterclaim preclude Dinosaur from obtaining judgment on the pleadings. BSI, relying on *Gen. Conference Corp. of Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989), argues that an affirmative defense raised in the answer bars judgment on the pleadings because the Court must accept all allegations pled by the non-moving party as true. BSI asserted the following affirmative defenses: the Complaint fails to state a claim upon which relief can be granted; the Complaint fails to state a claim because Dinosaur is not the real party in interest and does not have standing; Dinosaur is barred by the doctrines of estoppel, laches, waiver, and unclean hands; and Dinosaur is barred from recovery because it failed to mitigate its

damages.  BSI also states affirmative defenses relevant only to Dinosaur's conversion and breach of implied duty of good faith and fair dealing claims.

It is true that a defendant's answer or affirmative defenses may create a "material issue, of fact" barring a judgment on the pleadings.  *See, e.g. Gen. Conference Corp.*, 887 F.2d at 230 ("if the defendant raises an affirmative defense in his answer it will *usually* bar judgment on the pleadings") (emphasis added).  None of the affirmative defenses raised by BSI, however, raise material issues of fact that would bar judgment on the pleadings.  Although a moving party concedes the accuracy of factual allegations in the adversary's pleading for the purposes of Rule 12(c), it does not admit conclusions of law.  *Kaestner*, 2018 WL at *2.

None of BSI's affirmative defenses preclude a judgment on the pleadings.  BSI's defenses that the Complaint fails to state a claim lack merit, as Dinosaur clearly states a claim for breach of contract.  BSI alleges that Dinosaur failed to mitigate its damages and that Dinosaur is barred by the doctrine of laches, yet the breach did not occur until November 30, 2018, and Dinosaur immediately demanded its money back.

The Court also finds that BSI's defense of unclean hands lacks merit.  Under Missouri law, the "unclean hands" doctrine does not bar a claim for money damages.  *Union Elec. Co. v. Sw. Bell Tel. L.P.*, 378 F.3d 781, 788 (8th Cir. 2004) (citing *Marvin E. Nieberg Real Estate Co. v. Taylor–Morley–Simon, Inc.,* 867 S.W.2d 618, 626 (Mo. Ct. App. 1993)).  In this vein, Missouri courts have found that a defendant may not raise the equitable defense of unclean hands when a plaintiff is seeking the legal remedy of an amount allegedly owed in a breach of contract dispute.  *Howard v. Fid. Nat. Title Ins. Co.*, 2015 WL 5021768, at *9 (E.D. Mo. Aug. 24, 2015) (rejecting an unclean hands affirmative defense noting that equitable defenses are only available

when equitable remedies are sought).  Thus, the doctrine of unclean hands does not bar

Dinosaur's claim for money damages pursuant to BSI's breach of the IPSA.

As to the Counterclaim, BSI contends that its allegations demonstrate that Dinosaur did

not perform its obligations under the IPSA.  BSI refers to its claim that Dinosaur failed to

provide "material information" regarding the parties to the transaction.  (Doc. 31 at p. 15.)  This

claim fails for two reasons.  First, the payment order and supporting documentation submitted by

Dinosaur (Doc. 17) reveal that BSI was in fact apprised of the identities of the parties involved in

the Transaction, including the involvement of De Jesus & De Jesus as Escrow Agent.  BSI fails

to identify the "material information" Dinosaur allegedly omitted.  Further, even if Dinosaur did

omit material information, this would not justify BSI's retention of funds in clear violation of the

IPSA.  Finally, § 6.1 of the IPSA directs that "[a]dditional, relevant information" and not

information that is "material" may be requested by BSI, although the IPSA does not describe

what constitutes "[a]dditional, relevant information."

Accepting all facts pled by BSI as true, BSI is in breach of the IPSA for retaining the

$3,469,718.26.  BSI does not dispute that the IPSA controls.   The unambiguous terms of the

IPSA do not permit BSI to retain funds from the failed Transaction on the mere speculation of a

potential claim or loss.  Thus, Dinosaur will be granted judgment as a matter of law on its breach

of contract claim, and BSI will be directed to return the entrusted funds to Dinosaur along with

interest, costs, and attorney's fees.

As previously noted, Dinosaur also asserts claims of breach of good faith and fair dealing

(Count II), as well as conversion (Count III) based on BSI's withholding of the $3,469,718.26

from the failed Transaction.  Because the Court has found that Dinosaur is entitled to judgment

on its breach of contract claim and Dinosaur requests the same relief for all of its claims (the

return of the funds together with interest, costs, and attorney's fees), the Court need not reach these additional claims.

**B.     BSI's Counterclaim**

Dinosaur next argues that BSI's Counterclaim should be dismissed because it fails to state an actionable claim.

The distinction between a motion for judgment on the pleadings brought under Fed. R. Civ. P. 12(c) and a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6) "is purely formal, because we review [a] 12(c) motion under the standard that governs 12(b)(6) motions." *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  To survive a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff need not provide specific facts in support of its allegations, *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), but "must include sufficient factual information to provide the 'grounds' on which the claim rests, and to raise a right to relief above a speculative level." *Schaaf v. Residential Funding Corp.,* 517 F.3d 544, 549 (8th Cir. 2008) (citing *Twombly*, 550 U.S. at 555 & n.3).  This obligation requires a plaintiff to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  A complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Id.* at 562 (quoted case omitted) (emphasis in original).

On a motion to dismiss, the Court accepts as true all of the factual allegations contained in the complaint, even if it appears that "actual proof of those facts is improbable," *id.* at 556,

and reviews the complaint to determine whether its allegations show that the pleader is entitled to relief. *Id.* at 550 U.S. at 555-56; Fed. R. Civ. P. 8(a)(2). The principle that a court must accept as true all of the allegations contained in a complaint, however, is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678 (stating "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). Although legal conclusions can provide the framework for a complaint, they must be supported by factual allegations. *Id.* at 679. The plausibility of the plaintiff's claim is reviewed "as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Group,* 592 F.3d 893, 896 n.4 (8th Cir. 2010).

### 1.    Fraud

In Count I of its Counterclaim, BSI asserts a fraud claim. BSI alleges that Dinosaur "knew that the Transaction involved a party or parties that may cause the Transaction to be rejected." (Doc. 10 at p. 4.) BSI requests damages in the amount of not less than $75,000, in addition to pre-judgment and post-judgment interests and costs.

Dinosaur argues that BSI fails to allege fraud with particularity and, in the alternative, that BSI's allegations fail to state a claim.

The elements of a fraud claim are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. 2007)

(en banc).  In a case of concealment or nondisclosure, "a party's silence in the face of a legal

duty to speak replaces the first element: the existence of a representation."  *Id.*

Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the

circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "This particularity

requirement demands a higher degree of notice than that required for other claims."  *U.S. ex rel.*

*Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916 (8th Cir. 2014) (quoting

*United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003)).  "[T]o satisfy

Rule 9(b)'s particularity requirement, 'the complaint must plead such facts as the time, place,

and content of the defendant's false representations, as well as the details of the defendant's

fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained

as a result.'"  *Id.* at 916-17 (quoting *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556

(8th Cir. 2006)).  "Put another way, the complaint must identify the 'who, what, where, when,

and how' of the alleged fraud."  *Joshi*, 441 F.3d at 556 (quoting *Costner*, 317 F.3d at 888).

BSI claims it has set forth allegations sufficient to state a claim for both affirmative fraud

and fraudulent nondisclosure.  Specifically, BSI states that Dinosaur affirmatively represented

that the transmission of $17,348,645 did not involve any parties that would cause it to be

rejected.  BSI further alleges that Dinosaur failed to disclose "the true parties to the transaction

and the involvement of a Panama law firm to circumvent the Venezuelan court order that

required payment through a different escrow agent."  (Doc. 31 at p. 13.)  BSI states that the

alleged fraud occurred in Dinosaur's October 30, 2018 instructions (Doc. 17 at p. 3) for

transmission.  *Id.* at p. 15.  BSI further questions why the Panama law firm of De Jesus & De

Jesus was to receive a sum in excess of six million dollars to act as escrow agent.  (Doc. 10 at p.

2.)

BSI claims that Dinosaur had superior knowledge and access to the information regarding the Transaction that was material to BSI's decision to accept the Transaction, and had a duty to disclose the information. BSI states it reasonably relied on the information supplied by Dinosaur, as the originating party for the Transaction. Finally, BSI alleges it was damaged by Dinosaur's fraudulent misrepresentation and nondisclosure in that other clients have declined to do business with BSI or have demanded terms less favorable to BSI due to concerns for possible international sanctions.

The Court finds that BSI fails to state a fraud claim. BSI alleges that Dinosaur's October 30, 2018 instructions for transmission contained the alleged fraudulent statement or nondisclosure. Dinosaur attached the instructions for transmission as well as supporting documentation to its Answer. (Doc. 17.) These documents explicitly described De Jesus & De Jesus' role as Escrow Agent between PDVSA and Tipco. *See* Escrow Agreement, *id*. at pp. 21-25. Importantly, the payment requested by Dinosaur did not include the escrow fee for De Jesus & De Jesus, rather it was limited to the $17,348,645 attachment entered by the Curacao Court for the benefit of Energy Coal S.p.A., and against PdVSA. Additionally, Dinosaur's responsive communication reflected a similar concern about the six million dollars held for the benefit of De Jesus & De Jesus. In responding to BSI's concern, Dinosaur stated "it will execute no transaction related to these funds" until it "has satisfied its anti-money laundering and sanctions-related inquiries with respect to the residual $6,120,286.86." (Doc. 15-6 at p. 4.)

BSI argues that Dinosaur cannot rely on the documents it attached to its Answer because "BSI has not admitted any of the facts set forth in Dinosaur's exhibits, and they therefore remain in dispute." (Doc. 31 at p. 14.) As previously discussed, the payment instructions and supporting documentation are necessarily embraced by the pleadings and BSI does not dispute

their accuracy.  Ignoring these documents in connection with Dinosaur's Motion would only result in needless delay.  Dinosaur is entitled to judgment as a matter of law on Count I.

       **2.**       **Breach of Contract**

In Count II of the Counterclaim, BSI asserts a breach of contract claim.  BSI alleges that Dinosaur breached the IPSA by failing to provide "material information" regarding the Transaction pursuant to § 1.4.  (Doc. 10 at p. 5.)  BSI further alleges that it requested "material and relevant information regarding the Transaction" from Dinosaur after the Transaction was rejected, which Dinosaur failed to provide in violation of § 7.2 of the IPSA.

Section 1.4 provides that Dinosaur shall provide information as may be required for payment orders by BSI in accordance with § 6.1.  Section 6.1, titled "Payment Order Content," sets out the information Dinosaur must provide to BSI in each payment order.  This section contains a list of basic information—such as the amount of the transfer, account number, and name and address of the beneficiary—that is required to execute the payment order.  (Doc. 15-1 at p. 5.)  BSI fails to state a claim for breach of § 1.4.  The payment order provided all of the relevant information necessary to execute the Transaction.  BSI does not point to any items enumerated in § 6.1 that Dinosaur failed to provide.  Further, the IPSA does not provide for damages in the event a party failed to provide information pursuant to §§ 1.4 and 6.1.

Section 7.2 of the IPSA, titled "Inquiries by Authorities," states in relevant part that "in case of investigations by any competent authority exercising audit, review, regulatory, judicial, or legal power over a Party," the parties agree to provide each other with "mutual assistance in such investigations and to supply each other, with prior written intervention of the Authority or legal order, any Records related to such requirements of such Authority."  *Id.* at p. 6.  This provision additionally requires the parties to open investigations of their own employees or

agents to discover possible participation in illegal activities the date of any given payment order. *Id.*

BSI's allegations fail to state a claim for violation of § 7.2 because BSI does not assert that a "competent authority" ever initiated an investigation. Similarly, BSI does not allege Dinosaur failed to cooperate in an investigation of an employee accused of engaging in illegal activities. Thus, Dinosaur is entitled to judgment as a matter of law on Count II.

### 3. Indemnity

In Count III, BSI states that § 10 requires Dinosaur to indemnify BSI from any damages and attorney's fees it incurred as a result of the breach of the IPSA, infringement of laws, willful misconduct, fraud, intentional tort, or negligence of Dinosaur. (Doc. 10 at p. 6.) BSI alleges that it has incurred damages and attorney's fees "as a result of Dinosaur's breach of the IPSA, willful misconduct, fraud, negligence and possible infringement of laws in relation to the Transaction." *Id.*

The Court has found that BSI fails to state a claim for fraud or breach of contract. As such, BSI's current claim for indemnity based on Dinosaur's breach of the IPSA or fraud must fail. Further, BSI has not pled that any third party has made a claim against it for which Dinosaur is obligated to provide indemnification to BSI. Consequently, Count III fails to state a claim against Dinosaur; and Dinosaur is entitled to judgment as a matter of law on this claim.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff Dinosaur Merchant Bank Limited's Motion for Judgment on the Pleadings (Doc. 18) is **granted**. Dinosaur shall submit documentation supporting its request for attorneys' fees and expenses, along with a proposed judgment, no later

than **December 20, 2019**.  A separate judgment in favor of Plaintiff consistent with this

Memorandum and Order will issue.


                                        /s/ Abbie Crites-Leoni
                                        ABBIE CRITES-LEONI
                                        UNITED STATES MAGISTRATE JUDGE
Dated this 6th day of December, 2019.